SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
FRED R. PUGLISI, Cal. Bar No. 121822
VALERIE E. ALTER, Cal. Bar No. 239905
1901 Avenue of the Stars, Suite 1600
Los Angeles, California  90067-6055
Telephone: 310.228.3733
Facsimile: 310.228.3933
fpuglisi@sheppardmullin.com
valter@sheppardmullin.com

GARDNER GILLESPIE (appearing *pro hac vice*)
PAUL WERNER (appearing *pro hac vice*)
1300 I Street, N.W., 11th Floor East
Washington, D.C. 20005-3314
Telephone: 202.469.4916
Facsimile: 202.312.9453
ggillespie@sheppardmullin.com
pwerner@sheppardmullin.com

Attorneys for Defendants
TIME WARNER CABLE, INC. AND TIME
WARNER CABLE PACIFIC WEST LLC, d/b/a
TIME WARNER CABLE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES, a California municipal corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>TIME WARNER CABLE INC., TIME WARNER CABLE PACIFIC WEST LLC, et al.,<br><br>       Defendant. | Case No. 2:14-cv-01984-ODW (ASx)<br><br>**DEFENDANT TIME WARNER CABLE INC. AND TIME WARNER CABLE PACIFIC WEST LLC, d/b/a TIME WARNER CABLE'S:**<br><br>**(1) ANSWER AND AFFIRMATIVE DEFENSES;**<br><br>**(2) COUNTERCLAIM; AND**<br><br>**(3) DEMAND FOR JURY TRIAL** |

SMRH:201995710.1

## TIME WARNER CABLE'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

## PRELIMINARY STATEMENT

The Complaint filed by the City of Los Angeles ("LA" or "City") against Time Warner Cable ("TWC") is wrong on the facts and the law. And, equally important, it completely misstates the interests at stake here. Falsely accusing TWC of enjoying a "monopoly" in the City, the City says the company has harmed City taxpayers by failing to pay enough to support "core" services or the City's public, educational, and government ("PEG") access programming. But in reality the City has sued TWC in a cynical bid to extract more in hidden fees from TWC's *customers*. The fees that the City claims TWC owes would come directly from the pockets of the very taxpayers in whose name the City purportedly brings suit – and who already annually support the City by paying *millions*. The City already has collected from TWC and its customers 5 percent of its gross cable revenues in "franchise fees," the federal and state maximum, as well as an additional 1 percent of gross revenues in PEG fees since 2009. Not only do TWC's customers not owe the City any more money; they are entitled to refunds of overpayments to the City. TWC seeks the return of those funds here through its Counterclaim against LA.

TWC has resisted for years the City's effort to extract ever more fees from TWC and its customers who are LA residents and taxpayers. To be clear: Under federal and state law, the monies the City claims in this action would have been paid – and would be paid, if the City were successful here – by those City taxpayers who are TWC customers in the form of a direct and itemized fee on their monthly cable bills. It is therefore more than ironic that the City's Complaint accuses TWC of welching on money that "TWC owes to L.A. Taxpayers." Compl. at 1. [1] The truth

---

[1] In a display intended for full consumption by the Fourth Estate, the City Attorney handed out LA's Complaint at a press conference.

1  is that the money the City insists TWC should have paid to the City would have

2  been collected by TWC from the very taxpayers the City Attorney disingenuously

3  alleges are *owed* the monies.  Thus, the City's Complaint has the flow of monies

4  demanded in this case backwards: The monies the City seeks would come *from*

5  TWC's customers (the City's taxpayers) to be paid *to* the City, not *from* TWC *to* the

6  taxpayers.  Ultimately, therefore, this case is not about whether TWC unfairly

7  deprived the City's taxpayers of the monies supposedly to fund "core" services and

8  local access TV.  It is about whether TWC properly resisted facilitating the transfer

9  of many millions *from* its customer taxpayers *to* the City to fund – according to the

10  City – fire and police departments, sanitation, and public parks.

11       The City's claims are surprising and meritless.  *First*, the City seeks to

12  "double-dip" for PEG access support for 2008.  That year, TWC spent millions of

13  dollars to provide the City with numerous studios equipped and staffed for PEG

14  access as part of the transition from the prior local franchise regime to the state

15  franchise regime mandated by California's Digital Infrastructure and Competition

16  Act ("DIVCA").  Under DIVCA, TWC was required to continue to provide PEG

17  support mandated under its local franchises until January 2009.  And TWC did so,

18  spending millions on studios equipped and staffed for PEG access in 2008 alone.

19       Contrary to the plain intent of DIVCA, however, the City demands millions

20  more.  It was not enough to the City that TWC paid millions for PEG studios for

21  2008; it insisted that TWC collect from its customers and pay the City additional

22  millions in "PEG fees" in an amount of 1 percent of TWC's gross cable revenues.

23  This money was purported to allow the City to fund its *own* studio facilities the

24  same year.  Because the law does not compel such an absurd result – one that would

25  impose a needless financial burden on TWC's customers – TWC refused to collect

26  from its customers and pay any gross revenue PEG fees to the City in 2008.

27       In 2011, however, after wrangling unsuccessfully for years with the City,

28  TWC reluctantly paid the City 2008 PEG fees under protest.  At the same time,

TWC subtracted an identical amount from other monies that TWC had collected from its customers for payment to the City in the form of "franchise fees." That was reasonable and lawful. A cable operator's costs for providing PEG studios, as well as for providing other free and discounted services to a local franchising authority, constitute "franchise fees" under federal law. And since both federal and state law limits the total franchise fees that governmental authorities such as the City are permitted to impose on cable operators to 5 percent of gross cable revenues, TWC was entitled to set off from its total franchise fee payments the amount it was spending for PEG operating costs and the value of free services provided to the City.

So long as the City did not force the issue of its desired 1-percent PEG fee, TWC was content to continue to incur PEG costs with monies that it had not collected from its customers and that, when combined with the franchise fees it was paying, exceeded the cap mandated by federal, state, and local law. But when the City insisted that TWC pay the 1-percent PEG fee for 2008 in addition to the millions that TWC had already paid in that year to provide studios for PEG access, TWC set off the PEG fee against its other franchise fees. TWC thus credited against its total franchise fee payments some of its PEG costs, as well as the value of free and discounted services provided to the City. As a result, the City received exactly the same total in cash that it would have received had TWC not made the disputed PEG fee payment, and TWC did not further burden its customers by collecting any additional monies from them to meet the City's unlawful demand.

Under federal law, TWC was entitled to treat all of the monies it expended to provide the City with studios equipped for PEG access as franchise fees as well as the costs of other free and discounted services, and it was permitted to set off those monies against its franchise fee payments. TWC is thus entitled to recover any franchise fees paid in excess of the 5 percent cap, and TWC seeks those fees as damages from the City. Moreover, because DIVCA does not contemplate that TWC would pay a separate 1-percent PEG fee at the same time it was spending millions to

1  fund PEG studios, TWC is also entitled to recoup the 1-percent PEG fee payment

2  for 2008.

3      The City's Complaint piles on additional multi-million dollar claims that

4  TWC allegedly underpaid its franchise and PEG fees between 2008 and 2011 by

5  underreporting the "gross revenues" on which franchise and PEG fees are based.  As

6  noted, both federal law and DIVCA limit the amount of franchise fees that can be

7  imposed on a cable operator to 5 percent of gross revenues related to cable services.

8  DIVCA establishes that the franchise fee cap is to be calculated under Generally

9  Accepted Accounting Principles ("GAAP") and otherwise carefully limits what

10  constitutes "gross revenues" for fee purposes.

11      The City and TWC have had differences in the past about whether TWC's

12  calculations of its franchise fee payments have been correct, based on regular audits

13  conducted by the City's auditors.  Until now, the parties have resolved these issues

14  without the need for judicial resolution.  This year, however, the final results of the

15  City's audit for the years 2008 through 2011 were first provided to TWC only weeks

16  before the City filed suit.  When TWC reviewed the audit results, it quickly

17  determined that in a few respects the City's auditor was arguably correct in relying

18  on actual data that were available, rather than some estimates that TWC had

19  traditionally used.  Consequently, TWC advised the City before it filed suit that

20  TWC would make an additional payment to the City, and TWC did so earlier this

21  year.  But the City's other claims for millions of dollars of additional franchise fees

22  and interest are based on its aggressive and intentional misinterpretations of

23  "revenues" and allowable interest under GAAP and DIVCA.  On this issue, too,

24  TWC has declined to collect from its customers and pay the City money that the

25  City is not properly owed.  Accordingly, TWC is entitled to judgment that it has not

26  underpaid its franchise or PEG fees between 2008 and 2011.

27      Finally, after the end of 2008, TWC was permitted by DIVCA to cease

28  funding PEG studios, and it did so.  Instead, since 2009 TWC has collected from its

1  customers and paid the City gross-revenue PEG fees exceeding **$25 million**.  Under

2  federal law, those fees are exempt from being considered "franchise fees," subject to

3  the federal and state 5 percent cap, only to the extent they are "incurred in or

4  associated with the construction of PEG access facilities."  *Alliance for Community*

5  *Media v. FCC,* 529 F. 3d 763, 784, *reh. & reh. en banc den.* (6th Cir. 2008).  On

6  information and belief, however, millions of dollars in PEG fees that the City has

7  collected from TWC's customers have not been used for that purpose.  Accordingly,

8  TWC seeks a refund from the City on its customers' behalf of all PEG fees since

9  2009 that have not been used to construct PEG facilities.

10  Accordingly, in addition to answering LA's Complaint, TWC now

11  counterclaims against the City for damages to recover PEG fees, PEG costs, and

12  free services, as well as injunctive and declaratory relief.  Because TWC's

13  customers ultimately made most of the overpayments in the first place, TWC will

14  return to its current customers those overpayments that are recouped from the City.

### ANSWER & AFFIRMATIVE DEFENSES

16  For its Answer and Affirmative Defenses in response to the Complaint of the

17  City of Los Angeles ("City" or "LA"), Time Warner Cable ("TWC"), by and

18  through its undersigned counsel, states and alleges as follows:

### ANSWER

### I.  INTRODUCTION

21  1.  Numbered paragraph 1 of the Complaint states a legal conclusion to

22  which no response is required.  Answering further, to the extent a response is

23  deemed required, TWC denies the allegations of paragraph 1 of the Complaint.

24  Answering further, the City has filed this lawsuit to effect a transfer of wealth from

25  TWC's customers to the City of Los Angeles.

26  2.  Numbered paragraph 2 of the Complaint states a legal conclusion to

27  which no response is required.  Answering further, to the extent a response is

28  deemed required, TWC denies the allegations of paragraph 2 of the Complaint.

Answering further, the allegations set forth in this paragraph are blatantly and demonstrably false (and indeed contradicted by the City's own allegations): TWC does not enjoy any "monopoly" over any communications services in LA and certainly does not enjoy any such monopoly conferred by LA's regulatory fiat.

3.      Numbered paragraph 3 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent a response is deemed required, TWC denies the allegations of paragraph 3 of the Complaint.

4.      Numbered paragraph 4 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent a response is deemed required, TWC denies the allegations of paragraph 4 of the Complaint.

5.      Numbered paragraph 5 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent a response is deemed required, TWC denies the allegations of paragraph 5 of the Complaint.

6.      Numbered paragraph 6 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent a response is deemed required, TWC denies the allegations of paragraph 6 of the Complaint.

## II.      PARTIES AND JURISDICTION

7.      TWC admits the allegations of paragraph 7 of the Complaint.

8.      TWC denies the allegations of paragraph 8 of the Complaint.

9.      TWC denies the allegations of paragraph 9 of the Complaint.

10.     TWC admits the allegations of paragraph 10 of the Complaint.

11.     TWC denies the allegations of paragraph 11 of the Complaint.

12.     TWC denies the allegations of paragraph 12 of the Complaint.

13.     TWC admits that TWCI is a Delaware corporation with its principal place of business in New York.  Answering further, TWC admits that it operates cable systems in multiple geographic regions across the United States, including California.  TWC denies the remaining allegations of paragraph 13 of the Complaint.

14.     TWC admits the allegations of paragraph 14 of the Complaint.

15.     Numbered paragraph 15 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies that it underpaid any franchise and PEG fees owed to the City.

16.     Numbered paragraph 16 of the Complaint states a legal conclusion to which no response is required.

### III.     VENUE

17.     Numbered paragraph 17 of the Complaint states a legal conclusion to which no response is required.

### IV.     GENERAL ALLEGATIONS
### HISTORY OF CABLE FRANCHISES IN THE CITY OF LOS ANGELES

18.     Numbered paragraph 18 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC is without knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 18 of the Complaint concerning the City's actions and therefore denies those allegations.  Answering further, TWC admits that any fees paid by a cable operator to support PEG operating and maintenance are deductible from franchise fees collected by a cable operator and remitted to a franchising authority.

19.     Numbered paragraph 19 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC admits that any fees paid by a cable operator to support PEG operating and maintenance are deductible from franchise fees collected by a cable franchising authority.  Answering further, to the extent that the allegations of paragraph 19 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.  Answering further still, TWC is without knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered

paragraph 19 of the Complaint concerning what other franchise operators agreed to pay the City and therefore denies those allegations.

20.     TWC is without knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 20 of the Complaint and therefore denies those allegations.  TWC denies that it has not disputed the fees and payments demanded from the City.

21.     TWC denies the allegations of paragraph 21 of the Complaint.

22.     Numbered paragraph 22 of the Complaint states a legal conclusion to which no response is required.

23.     Numbered paragraph 23 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 23 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

24.     Numbered paragraph 24 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 24 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

25.     To the extent that the allegations of paragraph 25 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.  Answering further, TWC admits that PEG support is used to facilitate public, education, and government programming.   TWC denies the remaining allegations of paragraph 25 of the Complaint.

## **FRANCHISE REQUIREMENTS CHANGE SIGNIFICANTLY UNDER A NEW STATE SYSTEM**

26.     Numbered paragraph 26 of the Complaint states a legal conclusion to which no response is required.

27.     TWC admits the allegations of paragraph 27.

28.     Numbered paragraph 28 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 28 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

29.     Numbered paragraph 29 of the Complaint states a legal conclusion to which no response is required.

30.     Numbered paragraph 30 of the Complaint states a legal conclusion to which no response is required.

31.     Numbered paragraph 31 of the Complaint states a legal conclusion to which no response is required.

32.     Numbered paragraph 32 of the Complaint states a legal conclusion to which no response is required.

33.     Numbered paragraph 33 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent a response is deemed required, TWC denies the allegations of paragraph 33 of the Complaint.

34.     Numbered paragraph 34 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 34 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents. Answering further, to the extent a response is deemed required, TWC denies the allegations of paragraph 34 of the Complaint.

35.     Numbered paragraph 35 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC is without knowledge or information sufficient to form a belief as to the truth of the allegations asserted in numbered paragraph 35 of the Complaint concerning what payments other cable operators in the City began making in January 2008 and therefore denies those allegations.

36.     Numbered paragraph 36 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 36 of the Complaint.

37.     Numbered paragraph 37 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 37 of the Complaint.

38.     Numbered paragraph 38 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 38 of the Complaint.

**AFTER YEARS OF COMPLIANCE WITH STATE AND LOCAL FRANCHISE OBLIGATIONS, TIME WARNER CABLE SUDDENLY AND UNILATERALLY REFUSES TO PAY WHAT IT OWES**

39.     Numbered paragraph 39 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 39 of the Complaint.

40.     TWC denies the allegations of paragraph 40 of the Complaint.

41.     TWC denies the allegations of paragraph 41 of the Complaint.

42.     To the extent that the allegations of paragraph 42 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.  Answering further, TWC denies the allegations of paragraph 42 of the Complaint.

43.     Numbered paragraph 43 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 43 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents. Answering further, TWC denies the allegations of paragraph 43 of the Complaint.

44.     Numbered paragraph 44 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 44 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents. Answering further, TWC denies the allegations of paragraph 44 of the Complaint.

45.     Numbered paragraph 45 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 45 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

46.     TWC denies the allegations of paragraph 46.

47.     Numbered paragraph 47 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 47 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents. Answering further, TWC denies the allegations of paragraph 47 of the Complaint.

**THE CABLE ACT DOES NOT ALLOW A CABLE OPERATOR TO AVOID THE OBLIGATION OF PROVIDING NON-MONETARY SUPPORT FOR PEG ACCESS FROM ITS FRANCHISE FEE OBLIGATIONS**

48.    Numbered paragraph 48 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 48 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

49.    Numbered paragraph 49 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 49 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.  Answering further still, TWC denies the allegations of paragraph 49 of the Complaint.

50.    Numbered paragraph 50 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 50 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

51.    Numbered paragraph 51 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 51 of the Complaint.

52.    Numbered paragraph 52 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 52 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any

characterization of their contents that is inconsistent with the documents. Answering further, TWC denies the allegations of paragraph 52 of the Complaint.

53.    Numbered paragraph 53 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 53 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents. Answering further, TWC denies the allegations of paragraph 53 of the Complaint.

54.    Numbered paragraph 54 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 54 of the Complaint.

55.    TWC denies the allegations of paragraph 55 of the Complaint.

56.    TWC denies the allegations of paragraph 56 of the Complaint.

**NOT ONLY WAS THE Q1 2011 REDUCTION UNLAWFUL, IT WAS BARRED BY DIVCA**

57.    Numbered paragraph 57 of the Complaint states a legal conclusion to which no response is required.

58.    Numbered paragraph 58 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 58 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

59.    To the extent that the allegations of paragraph 59 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

60.    To the extent that the allegations of paragraph 60 of the Complaint purport to derive from documentary evidence, TWC states that such documents

speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

61.     Numbered paragraph 61 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 61 of the Complaint.

62.     TWC denies the allegations of paragraph 62 of the Complaint.

63.     Numbered paragraph 63 of the Complaint states a legal conclusion to which no response is required.

64.     Numbered paragraph 64 of the Complaint states a legal conclusion to which no response is required.

## NOT ONLY WAS THE Q1 2011 REDUCTION UNLAWFUL, A SUBSTANTIAL PORTION OF TWC'S REDUCTION WAS BARRED BY THE STATUTE OF LIMITATIONS

65.     Numbered paragraph 65 of the Complaint states a legal conclusion to which no response is required.

66.     Numbered paragraph 66 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 66 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents. Answering further still, TWC denies the allegations of paragraph 66 of the Complaint.

67.     Numbered paragraph 67 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 67 of the Complaint.

68.     Numbered paragraph 68 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 68 of the Complaint purport to derive from documentary evidence,

1  TWC states that such documents speak for themselves and expressly denies any

2  characterization of their contents that is inconsistent with the documents.

3  Answering further, TWC denies the allegations of paragraph 68 of the Complaint.

4  **TWC FAILED TO IDENTIFY, WITH ANY SPECIFICITY, THE EXPENSES**

5  **INCURRED IN SUPPORT OF PEG SERVICE, FACILITIES, AND**
   **EQUIPMENT WHEN IT TOOK THE SELF-HELP REDUCTION IN Q1 2011**

6

7       69.    Numbered paragraph 69 of the Complaint states a legal conclusion to

8  which no response is required.

9       70.    Numbered paragraph 70 of the Complaint states a legal conclusion to

10  which no response is required.

11      71.    Numbered paragraph 71 of the Complaint states a legal conclusion to

12  which no response is required.  Answering further, to the extent that the allegations

13  of paragraph 71 of the Complaint purport to derive from documentary evidence,

14  TWC states that such documents speak for themselves and expressly denies any

15  characterization of their contents that is inconsistent with the documents.

16      72.    TWC denies the allegations of paragraph 72 of the Complaint.

17      73.    TWC denies the allegations of paragraph 73 of the Complaint.

18  **IN ADDITION TO THE UNLAWFUL SELF-HELP IN 2011, TWC HAS**
    **ROUTINELY UNDERPAID BOTH THE STATE FRANCHISE FEES AND**

19  **THE STATE PEG FEES DURING CALENDAR YEAR**
    **2008 THROUGH 2011**

20

21      74.    Numbered paragraph 74 of the Complaint states a legal conclusion to

22  which no response is required.

23      75.    Numbered paragraph 75 of the Complaint states a legal conclusion to

24  which no response is required.

25      76.    Numbered paragraph 76 of the Complaint states a legal conclusion to

26  which no response is required.

27      77.    Numbered paragraph 77 of the Complaint states a legal conclusion to

28  which no response is required.

78. TWC denies the allegations of paragraph 78 of the Complaint.

79. To the extent that the allegations of paragraph 79 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

80. TWC denies the allegations of paragraph 80 of the Complaint.

81. TWC denies the allegations of paragraph 81 of the Complaint.

82. TWC denies the allegations of paragraph 82 of the Complaint.

83. To the extent that the allegations of paragraph 83 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

84. TWC denies the allegations of paragraph 84 of the Complaint.

85. TWC denies the allegations of paragraph 85 of the Complaint.

86. To the extent that the allegations of paragraph 86 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

87. TWC denies the allegations of paragraph 87 of the Complaint.

88. TWC denies the allegations of paragraph 88 of the Complaint.

89. TWC denies the allegations of paragraph 89 of the Complaint.

90. TWC denies the allegations of paragraph 90 of the Complaint.

91. To the extent that the allegations of paragraph 91 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

92. TWC denies the allegations of paragraph 92 of the Complaint.

93.     TWC admits that the City has demanded it to pay additional fees that would be collected from its customers.  Answering further, TWC denies the allegations of paragraph 93 of the Complaint.

94.     TWC denies the allegations of paragraph 94 of the Complaint.

95.     To the extent that the allegations of paragraph 95 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.  Answering further, TWC admits the parties have not resolved their dispute over PEG and franchise fees.

## V.     FIRST CLAIM FOR RELIEF
### (Violation of Los Angeles City Code)

96.     TWC incorporates by reference its responses above to each and every allegation in numbered paragraphs 1 through 95 of the Complaint as if fully restated herein.

97.     Numbered paragraph 97 of the Complaint states a legal conclusion to which no response is required.

98.     TWC denies the allegations of paragraph 98 of the Complaint.

99.     TWC denies the allegations of paragraph 99 of the Complaint.

100.   TWC denies the allegations of paragraph 100 of the Complaint.

101.   TWC denies the allegations of paragraph 101 of the Complaint.

102.   TWC denies the allegations of paragraph 102 of the Complaint.

103.   TWC denies the allegations of paragraph 103 of the Complaint.

104.   Paragraph 104 of the Complaint sets forth no allegations.

## VI.     SECOND CLAIM FOR RELIEF
### (Violation of DIVCA)

105.   TWC incorporates by reference its responses above to each and every allegation in numbered paragraphs 1 through 104 of the Complaint as if fully restated herein.

106.   Numbered paragraph 106 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC denies the allegations of paragraph 106 of the Complaint.

107.   TWC denies the allegations of paragraph 107 of the Complaint.

108.   Numbered paragraph 108 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 108 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

109.   Numbered paragraph 109 of the Complaint states a legal conclusion to which no response is required.

110.   Numbered paragraph 110 of the Complaint states a legal conclusion to which no response is required.

111.   Numbered paragraph 111 of the Complaint states a legal conclusion to which no response is required.  Answering further, TWC admits that it has overpaid franchise fees to Los Angeles.

112.   TWC denies the allegations of paragraph 112 of the Complaint.

113.   TWC denies the allegations of paragraph 113 of the Complaint.

114.   TWC denies the allegations of paragraph 114 of the Complaint.

115.   TWC denies the allegations of paragraph 115 of the Complaint.

116.   TWC denies the allegations of paragraph 116 of the Complaint.

## VII.   <u>THIRD CLAIM FOR RELIEF</u>
### (Violation of False Claims Act)

117.   TWC incorporates by reference its responses above to each and every allegation in numbered paragraphs 1 through 116 of the Complaint as if fully restated herein.

118.   Numbered paragraph 118 of the Complaint states a legal conclusion to which no response is required.

119.   Numbered paragraph 119 of the Complaint states a legal conclusion to which no response is required.

120.   Numbered paragraph 120 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 120 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

121.   Numbered paragraph 121 of the Complaint states a legal conclusion to which no response is required.  Answering further, to the extent that the allegations of paragraph 121 of the Complaint purport to derive from documentary evidence, TWC states that such documents speak for themselves and expressly denies any characterization of their contents that is inconsistent with the documents.

122.   TWC denies the allegations of paragraph 122 of the Complaint.

123.   TWC denies the allegations of paragraph 123 of the Complaint.

124.   TWC denies the allegations of paragraph 124 of the Complaint.

125.   TWC denies the allegations of paragraph 125 of the Complaint.

126.   TWC denies the allegations of paragraph 126 of the Complaint.

127.   TWC denies the allegations of paragraph 127 of the Complaint.

128.   TWC denies the allegations of paragraph 128 of the Complaint.

129.   TWC denies the allegations of paragraph 129 of the Complaint.

130.   TWC denies the allegations of paragraph 130 of the Complaint.

131.   TWC denies the allegations of paragraph 131 of the Complaint.

132.   TWC denies the allegations of paragraph 132 of the Complaint.

### RESPONSE TO PRAYER FOR RELIEF

133.   TWC denies that LA is entitled to any relief whatsoever in this action, either as prayed for in its Complaint or otherwise.

## VIII.  GENERAL DENIAL

134.   TWC denies each and every allegation of fact, conclusion of law, or other matter contained in LA's Complaint not specifically admitted herein.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

#### (Failure To State A Claim)

135.   LA's Complaint fails to state any legally cognizable claim for relief and is therefore subject to dismissal pursuant to Rule 12 of the Federal Rules of Civil Procedure.

### SECOND AFFIRMATIVE DEFENSE

#### (DIVCA)

136.   LA's claims are barred and preempted by DIVCA.

### THIRD AFFIRMATIVE DEFENSE

#### (Franchise Agreement)

137.   LA's claims are barred and preempted by its franchise agreement with TWC.

### FOURTH AFFIRMATIVE DEFENSE

#### (Ordinance And LA Administrative Code)

138.   LA's claims are barred and preempted by its own ordinance and Administrative Code.

### FIFTH AFFIRMATIVE DEFENSE

#### (Federal Cable Act Preemption)

139.   LA's claims are barred and preempted by the Federal Cable Act.

### SIXTH AFFIRMATIVE DEFENSE

#### (Set Off/ Recoupment)

140.   TWC is entitled to set off or recoupment against any amount that LA recovers against TWC based on TWC's overpayment according to federal law of franchise fees in the form of PEG support and free services provided to LA.

## SEVENTH AFFIRMATIVE DEFENSE

### (Lack of Injury/ Damages)

141.   LA has suffered no damages attributable to TWC.

## EIGHTH AFFIRMATIVE DEFENSE

### (Contracts Clause)

142.   LA's claims are barred by the contracts clause of the federal and California constitutions.

## NINTH AFFIRMATIVE DEFENSE

### (Statute Of Limitations)

143.   LA's claims are barred, in whole or in part, by the applicable statutes of limitations.

## TENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

144.   LA's claims are barred by the doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Waiver)

145.   LA's claims are barred by the doctrine of waiver.

## TWELFTH AFFIRMATIVE DEFENSE

### (Estoppel)

146.   LA's claims are barred by the doctrine of estoppel.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Laches)

147.   LA's claims are barred by the doctrine of laches.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Accord And Satisfaction)

148.   LA's claims are barred by the doctrine of accord and satisfaction.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Settlement Agreement)

149.   LA's claim for additional franchise fees based on gross revenues from 2007 are barred by the parties' 2011 settlement agreement resolving all franchise fee claims for 2007.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing/ No injury)

150.   LA lacks standing to bring any claim for failing to provide sufficient gross revenue documentation under FCC rules and regulation and has suffered no injury based on any alleged violations of FCC rules and regulations.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Reservation)

151.   TWC expressly reserves the right to assert and raise any and all additional affirmative defenses made known to it through investigation and discovery.

**WHEREFORE**, having fully answered, TWC respectfully requests the Court to enter judgment in its favor against LA, dismiss its Complaint with prejudice, award TWC its fees and costs incurred in defending this action, and award such other relief as the Court may deem just and proper.

1   Dated:  May 15, 2014

2

3                                            SHEPPARD, MULLIN, RICHTER & HAMPTON  LLP

4

5

6                           By    _____
                                              /s *Valerie E. Alter*

7                                  FRED R. PUGLISI
                                   VALERIE E. ALTER
8                                  GARDNER GILLESPIE (appearing *p.h.v.*)
                                   PAUL WERNER (appearing *p.h.v.*)
9

10                                 Attorneys for Defendants
                                   TIME WARNER CABLE, INC.,
11                                 TIME WARNER CABLE PACIFIC WEST LLC,
                                   d/b/a TIME WARNER CABLE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNTERCLAIM

For its Counterclaim against the City of Los Angeles, TWC alleges as follows:

## PARTIES

1.      Counterclaimant Time Warner Cable, Inc., is a Delaware corporation with its principal place of business in New York.

2.      Counterclaimants Time Warner Cable Pacific West, LLC ("TWPW"), and Time Warner Cable Enterprises, LLC, are Delaware Limited Liability Companies with no members who are California residents.

3.      Time Warner Entertainment-Advance Newhouse ("TWEAN") is a New York Partnership with its principal place of business in New York.  None of TWEAN's partners are residents of California.[2]

4.      TWC is a franchised cable operator that provides a variety of communications services – including cable video, video-on-demand, high-speed internet access, and digital phone service – to residents throughout numerous California communities.

5.      Defendant City of Los Angeles ("City" or "LA") is a municipality incorporated under the laws of the State of California.

6.      TWC has served LA residents for decades, first according to the terms of local franchise agreements with the City and, more recently, pursuant to a state-issued franchise.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because TWC alleges violations of federal law.

8.      This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states and the

---

[2] For ease of reference, all counterclaimants will be referred to collectively as TWC.

1 matter involved exceeds the sum or value of $75,000, exclusive of interest and costs.

2 *See* 28 U.S.C. § 1332.

3       9.     Venue lies in the Central District of this Court pursuant to 28 U.S.C.

4 §§ 1441(a) and 1391(b) because the alleged events and/or omissions giving rise to

5 LA's claims and TWC's counterclaims occurred in this District.  *See* 28 U.S.C.

6 § 1391(b).

7 <u>**REGULATORY BACKGROUND**</u>

8       10.    The relationship between cable operators and local franchising

9 authorities is governed by federal and state law.

10       **A.**    **Federal Law Carefully Limits The Fees That Franchising**

11                 **Authorities May Extract From Cable Operators.**

12       11.    Under the federal Cable Act, in order to operate a cable system in any

13 given community, a cable operator must obtain a franchise from the relevant

14 franchising authority.  *See* 47 U.S.C. § 541(b).

15       12.    In turn, franchising authorities are vested with limited regulatory

16 oversight over cable operators.  *See id.* §§ 521 *et seq.*  Among other things, a

17 franchising authority may impose a "franchise fee" on a franchised cable operator in

18 exchange for granting a franchise.  *See id.* § 542.

19       13.    "Franchise fees" are limited under the Cable Act to 5 percent of gross

20 revenues derived from the provision of cable service.  *Id.*

21       14.    Federal law permits cable operators to pass franchise fees imposed by a

22 franchising authority through to their customers as a direct line item on their cable

23 bill.  *See id.* § 542(c).

24       15.    In addition to collecting franchise fees, a franchising authority may

25 impose additional costs on cable operators and their customers to support public,

26 educational, and governmental program access.  *See id.* § 541(a)(4)(B).  Thus, a

27 franchise authority may "require adequate assurance that the cable operator will

28

provide adequate public, educational, and governmental [('PEG')] access channel capacity, facilities, or financial support." *Id.*

16.    Financial support for PEG access that is used to meet PEG-related "capital costs" – costs "incurred in or associated with the construction of PEG access facilities" – are exempt from the definition of franchise fees. *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended*, First Report & Order, 22 FCC Rcd 5101, 5150 (2007) ("*First Section 621 Order*"), *aff'd sub nom., Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 782-83 (6th Cir. 2008).

17.    PEG support imposed by a franchising authority that is not used for capital costs, however, is *not* exempt from being considered in determining whether the 5-percent franchise fee cap has been exceeded. *See id.* § 542(g)(2)(C). These types of costs include "contributions in support of PEG services," such as costs incurred for staffing, training, and other operational costs borne by the cable operator in providing PEG studios and equipment. *See First Section 621 Order*, 22 FCC Rcd at 5151, ¶ 109.

18.    Under federal law, costs incurred by a cable operator for operating PEG studios, as well as for providing franchising authorities with free and discounted services, thus qualify as franchise fees subject to the 5-percent statutory cap. The Federal Communications Commission ("FCC") reaffirmed this rule in 2007, over the objections of local franchising authorities across the country, including LA. The FCC held that the costs incurred by a cable operator for operating PEG studios, as well as for providing franchising authorities with free and discounted services, qualify as franchise fees subject to the 5-percent statutory cap. *See First Section 621 Order*, 22 FCC Rcd at 5149-52, ¶¶ 104, 109; *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended*, Second Report & Order, 22 FCC Rcd 19633, 19638, ¶ 11 & n.32 (2007) ("*Second Section 621 Order*").  Local franchising authorities, including LA, challenged the FCC's

decision again unsuccessfully on appeal.  *See Alliance for Cmty. Media*, 529 F.3d at 782-83.  The City is attempting to use this case to try, once again, to overturn the decision of the FCC – this time in federal district court.

19.     In light of the FCC's decisions, it is beyond clear that amounts paid by a cable operator to support PEG access operations or maintenance are subject to the overall statutory 5 percent franchise fee cap.  Stated differently, the combined amount of PEG operational and maintenance costs incurred by a cable operator and separate franchise fees cannot exceed 5 percent.  *See id.*

20.     Cable operators have a federal right to, and do, pass through the cost of PEG obligations to their customers as a separate line item on their bills.  *See* 47 U.S.C. §§ 542(c)(2).  Consequently, while PEG obligations are ostensibly imposed on cable operators, the true costs of PEG are ultimately and directly funded by cable customers.

21.     When a state, municipality, county, or other governmental authority (individually or collectively) already charges the maximum 5 percent franchise fee, the value of non-capital PEG support and free services provided to the government entities is subject to offset against the cable operator's franchise fee payments.  *See* 47 U.S.C. § 542; *First Section 621 Order*, 22 FCC Rcd 5101, ¶¶ 101 & 104.  In other words: the value of any "free or discounted services provided to an [local franchising authority] . . . count towards the [cable] provider's franchise fee payments."  *Id.* ¶ 104.

### B.     California Prevents Local Governments From Exceeding Federal Fee Caps Or Double-Dipping From Cable Customers To Support Local PEG Access.

22.     Before 2007, the relevant cable franchising authorities in California were local governments, such as LA.

23.     In 2007, however, California re-ordered this regulatory regime by enacting the Digital Infrastructure and Video Competition Act ("DIVCA") to

implement a state franchising scheme for video services providers.  *See* Cal. Pub. Util. Code § 5800 *et seq.*

24.     With DIVCA, the California Legislature expressly sought to promote "[i]ncreased competition for video and broadband services," "lower[ ] prices" for consumers, and to foster a "fair and level playing field for all market competitors that does not disadvantage or advantage one service provider or technology over another."  *Id.* § 5810(a)(1)(C); *id.* § 5810(a)(2)(A).

25.     DIVCA also aims to ensure that local governments continue to maintain control over their rights of way and have "continue[d] access to and maintenance of [PEG] channels."  *Id.* § 5810(C) & (F).

26.     To provide a smooth transition for existing cable operators [3] and their local franchising authorities, DIVCA provides that an incumbent cable operator holding a local franchise may opt into a state franchise when, among other things, another video service provider enters the same market under a state franchise.  *See id.* § 5840(o)(1)-(3).

_____

[3]  DIVCA defines a "cable operator" as "any person or group of persons that either provides cable service over a cable system and directly, or through one or more affiliates, owns a significant interest in a cable system; or that otherwise controls or is responsible for, through any arrangement, the management and operation of a cable system, as set forth in Section 522(5) of Title 47 of the United States Code." Cal. Pub. Util. Code § 5830(c).  Likewise, a "[v]ideo service provider means an entity providing video service."  *Id.* § 5830(t).   DIVCA defines "video service" as "video programming services, cable services, or OVS service provided through facilities at least in part in public rights-of-way without regard to delivery technology, including Internet protocol or other technology.  This definition does not include (1) any video programming provided by a commercial mobile service provider defined in Section 332(d) of Title 47 of the United States Code, or (2) video programming provided as part of, and via, a service that enables users to access content, information, electronic mail, or other services offered over the public Internet."  *Id.* § 5830(s).

27.     As part of this recognized transition, and to ensure the statutory objective of ensuring "access to and maintenance of [PEG] channels," DIVCA expressly addresses cable operators' obligations to support PEG programming. *Id.* § 5810(a)(2)(C).

28.     DIVCA provides that cable operators are obligated to continue to provide PEG support mandated under a local franchise until the date that franchise would have expired absent DIVCA: "All obligations to provide and support PEG channel facilities . . . contained in a locally issued franchise existing on December 31, 2006, shall continue . . . until the term of the franchise would have expired if it had not been terminated . . . or January 1, 2009, whichever is later." *Id.* § 5870(k).

29.     DIVCA also addresses PEG obligations following an incumbent cable operator's transition to a state franchise. To ensure "continue[d] access to and maintenance of [PEG] channels," once local franchising authorities no longer have authority to require PEG support through the local franchising process, the statute authorizes local governments, by ordinance, to "establish a fee to support PEG channel facilities consistent with federal law that would become effective subsequent to the expiration of any fee imposed pursuant to subdivision (l)." *Id.* at § 5870(n). Accordingly, once the incumbent cable operator's PEG support obligations under its local franchise expire, a local government may collect a PEG fee under DIVCA to replace them.

30.     The DIVCA PEG fee is generally limited to 1 percent of a cable operator's gross cable revenues. *See id.*

31.     As under federal law, DIVCA expressly provides that "[t]he holder of a state franchise may recover the amount of any fee remitted to a local entity under this section by billing a recovery fee as a separate line item on the regular bill of each subscriber." *Id.* § 5870(o). Thus, whatever DIVCA PEG fee a franchising authority imposes under DIVCA is ultimately, and directly, imposed on TWC's customers as a line item on their cable bill.

32.   DIVCA also permits local governments to charge cable operators a maximum franchise fee of 5 percent of gross revenues.  *Id.* § 5860(a).

33.   DIVCA sets forth a detailed definition of "gross revenues."  In general, "gross revenues" means "all revenue actually received by the holder of a state franchise, as determined in accordance with generally accepted accounting principles [("GAAP")], that is derived from the operation of the holder's network to provide cable or video service within the jurisdiction of  the local entity."  *Id.* § 5860(d).

34.   Thus, for determining gross revenues under DIVCA, a cable operator is instructed to "use the same method of determining revenues under [GAAP] as that which the video service provider uses in determining revenues for the purpose of reporting to national and state regulatory agencies."  *Id.* § 5860(g).

35.   DIVCA also excludes certain monies from the statutory definition of gross revenues even if they would be considered "revenue" under GAAP.  Thus, among other things, gross revenue expressly excludes "amounts billed to, and collected from, subscribers to recover any tax, fee, or surcharge imposed by any governmental entity on the holder of a state franchise."  *Id.* § 5860(e)(6).

36.   A local government is strictly prohibited, however, from demanding any additional fees or charges or other remuneration of any kind from a cable operator holding a state franchise because of its status as a cable service provider. *Id.* § 5860(c).

### C.   LA's Administrative Code Also Limits Franchise And PEG Fees.

37.   LA requires a cable operator holding a state video franchise operating within its boundaries to pay a fee equal to 5 percent of its gross revenues.  *See* LA Admin. Code § 13.61.1(a).

38.   LA additionally requires a cable operator holding a state video franchise operating within its boundaries to pay a fee equal to 1 percent of its gross

1   revenues, which "shall be used by the City for PEG purposes consistent with state

2   and federal law."  *Id.* § 13.61.1(b).

3        39.    LA's Administrative Code defines "gross revenues" consistently with

4   state law, *see id.* § 13.61.1(c), as "all revenue actually received by the holder of a

5   state franchise, as determined in accordance with generally accepted accounting

6   principles."  Cal. Pub. Util. Code § 5860(d).

## FACTUAL ALLEGATIONS

    **A.**    **TWC Has Served LA Residents Under A Patchwork Of Local Franchises Requiring Extensive Cash Outlays To Provide The City Fully-Equipped Studios For PEG Access.**

11        40.    TWC is a franchised cable operator that has provided service to

12   residents of LA since the 1990s.

13        41.    TWC offers City residents a variety of communications services,

14   including cable video, video-on-demand, high speed internet, and digital phone

15   service.

16        42.    TWC initially provided service to City residents pursuant to a

17   patchwork of local franchises covering discrete areas of LA.

18        43.    Each of TWC's local franchises obligated it to pay the City 5 percent of

19   its gross revenues as an annual franchise fee.  *See* Exhibits ("Exhs.") 1-12.

20        44.    Each of these local franchises also required TWC to provide extensive

21   support for the City's PEG access programming.  *See* Exhs. 1-12.  Thus, among

22   other things, TWC was obligated to:

- Provide the City with channel capacity for PEG programming.

- Support the City's PEG access by providing studio facilities, including equipment and staff, for the City's use.  (TWC was in fact obligated to provide multiple studios in a number of franchise areas.)

- And pay all operating expenses associated with providing fully-equipped studios for the City's use for PEG access, which include, among other things, rent, utility charges, equipment costs, and staff salaries.

45.     TWC has incurred costs running into the millions of dollars in fulfilling its PEG access obligations under its local LA franchises.

46.     Indeed, in 2008 alone, TWC incurred millions of dollars in expenses to provide the City with numerous PEG access studios.  And in prior years, as well, TWC incurred equivalent expenses for the same purposes.

47.     TWC was also obligated under its local franchises to provide the City with additional free and discounted services.

48.     TWC's cash outlays in 2008 and earlier on PEG studios for the City, as well as the costs of the free and discounted services it provided the City, constitute franchise fees under federal and state law that the City has failed to credit.

49.     Because TWC also paid LA a franchise fee of 5 percent of its gross revenues in 2008 and prior years, TWC's additional outlays resulted in TWC paying LA excessive and unlawful franchise fees.

50.     TWC and its customers have been harmed by the City's unlawful exaction of excessive and unlawful franchise fees.

**B.     LA Improperly Extracted Gross Revenue PEG Fees For 2008 On Top Of The Millions TWC Spent On Studios For PEG Access.**

51.     In addition to the millions that TWC spent on PEG studios for the City in 2008 and earlier – which constituted franchise fees – the City also demanded that TWC remit millions more in the form of a 1-percent gross revenue PEG fee imposed on its customers for 2008.

52.     TWC initially resisted remitting the additional millions of dollars the City demanded from its customers because it is not lawful for the City to double-dip for PEG support under DIVCA in this fashion.

53.     After years of trying to convince the City that its demand for gross revenue PEG fees for 2008 was unlawful, TWC ultimately relented and paid the City the additional fees under protest.

54.     Given that TWC had already paid excessive franchise fees for 2008 and prior years, TWC offset this amount from the franchise fees that it collected from its customers and remitted to the City in 2011.

55.     LA's demand that TWC pay gross revenue PEG fees in 2011 for 2008 was unlawful under DIVCA.

### C.     TWC Obtained A DIVCA Franchise And Started Paying Gross Revenue PEG Fees That The City Has Not Used For Capital Expenditures.

56.     TWC obtained a DIVCA franchise in January 2, 2008, and its local franchises were terminated at that time.  Pursuant to DIVCA, TWC's PEG obligations under its local franchises ran until January 1, 2009.

57.     After its local PEG obligations terminated, TWC began paying the City 1 percent of its gross revenues to support the City's PEG capital costs so that the City could construct its own PEG facilities in lieu of those historically provided to the City by TWC.

58.     As authorized by federal and state law, TWC passed those fees through to its customers as a line item on their bills.

59.     As a result, between 2009 and present, TWC's customers have paid LA over *twenty-five million dollars* in gross revenue PEG fees limited to use on PEG-related capital expenditures such as construction of studio facilities.

60.     On information and belief, however, LA has not used the funds collected from TWC's customers for capital expenditures on PEG access that would be excepted from the federal definition of franchise fees.

> **D.     LA Has Adopted Aggressive And Incorrect Interpretations of "Gross Revenues" To Extract Even More Fees From TWC And Its Customers.**

61.     Just before filing suit against TWC, the City provided TWC with the results of an audit of its franchise and PEG fee payments covering 2008 to 2011.

62.     Based on the audit results, the City alleged that TWC had underpaid nearly $2.2 million in franchise fees, nearly $350,000 in PEG fees, and additionally claimed more than two million dollars in interest.

63.     Once it was able to review the audit findings, TWC quickly agreed that the auditor was correct in certain limited respects by relying on actual data rather than estimates.  Accordingly, because TWC has always made clear that it would pay amounts properly due the City, TWC advised the City it would make additional payments related to early termination fees and payment reversals, and subscriber bad debt.

64.     TWC has remitted those additional monies to the City.

65.     TWC refused to pay additional amounts, however, that are claimed based on incorrect applications of GAAP, are in conflict with DIVCA, and are otherwise unreasonable and unlawful.

66.     LA seeks to recover additional franchise fees based on subscriber revenues from 2007 (even though the City's audit covers 2008 to 2011) based on TWC's transition from cash to accrual accounting.

67.     However, LA and TWC had previously resolved, through a settlement agreement entered in 2011, all claims related to franchise fees for 2007. Accordingly, the City is not entitled to additional franchise fees from 2007.

68.     The City claims that TWC failed to pay franchise fees on top of the PEG fees that it collected from its customers.  In other words:  The City seeks to collect a fee on a fee.  But the City's effort to extract a fee on a fee from TWC and its customers is flatly unlawful: DIVCA expressly excepts PEG fees from the definition of gross revenues.  Otherwise, TWC's customers would be called on to pay the City a franchise fee for paying the City a PEG fee.

69.     The City claims that TWC's franchise fees were understated based on non-subscriber revenues.  But the City has refused, to date, to share with TWC the data and work papers supporting its demand, which is improper and unlawful in any event.

70.     LA seeks additional franchise fees for 2008 from TWC based on agency fees and discounts that TWC received from an advertising agency prior to acquiring that agency in 2008.

71.     TWC began treating certain fees and discounts from the agency as revenue in March 2008, when it acquired the company.  Under GAAP, the City is not entitled to treat such fees and discounts as revenues prior to TWC's acquisition in March 2008.

72.     Additionally, the City's audit determined that TWC overpaid franchise fees in 2008 based on advertising revenues overstated by more than $75,000.  TWC is entitled to a return of this overpayment.

73.     The City's audit similarly revealed that TWC overpaid franchise fees for 2010 and 2011 based on overstated advertising revenues. TWC is entitled to a return of these overpayments as well.

74.     The City seeks additional franchise fees based on its characterization of programming launch support payments as gross revenues.  But GAAP treats such payments as a price reduction in the programs, not revenues.  Accordingly, the City's demand for additional franchise fees from TWC for launch support is unreasonable and unlawful.

75.     The City seeks additional franchise fees in the form of fees TWC paid to the California Public Service Commission between 2010 and 2011.  But these payments were deducted from TWC's franchise fee payments to the City because the PUC fees themselves constitute franchise fees, *see Los Angeles v. Time Warner NY Cable LLC*, CV112-06655 (JCx) (C.D. Cal., July 3, 2013).  Because TWC has paid more than the federal and state maximum franchise fees already (5 percent of gross revenues), these payments were properly subtracted by TWC.

76.     The City also claims that TWC underpaid its 1-percent PEG fees by understating its gross revenues between 2008 and 2011.  But the City cannot properly claim any gross revenue PEG fees from TWC for 2008 (when TWC was still fulfilling the PEG obligations under its local franchises).  And TWC has already paid the City additional monies properly owed for the audit years.  The City's claims for additional gross revenue PEG fees based on mistaken and unreasonable assertions are invalid for the same reasons as its claims for additional franchise fees based on erroneous classification of monies as "revenues."

77.     The City additionally claims millions of dollars in interest to which it is not entitled.  TWC has already paid any interest owed on franchise fee payments that should have been made, and the City's claim for additional fees is unlawful.

78.     The City's audit also improperly calculates interest using compounding, which is not permitted under DIVCA.

79.     Nor can the City properly claim interest on allegedly underpaid DIVCA PEG fees – which were not in fact underpaid in any event – because DIVCA does not permit interest on any such underpayments.

80.     Any monies recouped by TWC through this lawsuit will be returned to its customers.

## COUNTERCLAIMS
## FIRST COUNTERCLAIM FOR RELIEF
### (VIOLATIONS OF FEDERAL CABLE ACT)

81.   TWC re-alleges and incorporates by reference the allegations of paragraphs 1-80, above, as if they were fully set forth herein.

82.   The federal Cable Act prohibits a franchising authority from collecting franchise fees in excess of 5 percent of a cable operator's gross revenues from cable service within the franchise territory.

83.   PEG operating support costs and free or discounted services provided to a municipality constitute franchise fees under federal law and are therefore counted towards the 5 percent cap on such fees.

84.   In 2008 and prior years, TWC expended millions of dollars to support the operating and maintenance costs of LA's PEG programming, as well as provided free and discounted services, that properly constitute franchise fees under the Cable Act.

85.   TWC has also paid LA millions of additional dollars for PEG capital support.

86.   On information and belief, however, these funds have not been used to construct PEG facilities, and therefore are not entitled to exemption from the federal definition of franchise fees.  As a result, these payments constitute additional unlawful franchise fees in excess of the federal cap.

87.   For each franchise year, in addition to these amounts, LA has charged, and TWC has paid, additional franchise fees equaling 5 percent of its gross revenues.

88.   As a result, LA has collected excessive franchise fee payments from TWC in violation of the Cable Act.

89.   TWC and its customers have been harmed by the excessive franchise fees it has paid to LA.

90.     Based on LA's violations of the Cable Act TWC is entitled to have these excessive franchise fees, plus interest, disgorged to it so that the monies can be credited to TWC's customers, in an amount shown at trial, in addition to injunctive and declaratory relief.

## SECOND COUNTERCLAIM FOR RELIEF
## (VIOLATIONS OF DIVCA)

91.     TWC re-alleges and incorporates by reference the allegations of paragraphs 1-90, above, as if they were fully set forth herein.

92.     DIVCA bars a franchising authority from simultaneously collecting PEG support under the terms of a local franchise and through a 1-percent gross revenue charge passed through to cable customers.

93.     DIVCA additionally prohibits a franchising authority from collecting franchise fees in excess of 5 percent of a cable operator's gross revenues.

94.     DIVCA further bars any local entity from demanding any additional fees from a state-franchise holder.

95.     Amounts paid by a cable operator to support PEG access operations and maintenance constitute franchise fees.

96.     In 2008 and prior years, TWC spent millions of dollars to support the operating and maintenance costs of LA's PEG programming under the terms of local franchises.

97.     The millions of dollars that TWC expended on operating and maintenance costs to support LA's PEG programming constitute franchise fees under DIVCA.

98.     Beginning in 2009, TWC also annually paid LA 1 percent of its gross revenues – amounting to more than $25 million dollars – ostensibly to support the City's PEG capital costs for constructing PEG facilities.

99.   Additionally, in 2011, TWC paid LA 1 percent of its gross revenues – amounting to millions of dollars – ostensibly to support the City's PEG capital costs – for 2008.

100.   Since at least 2006, the City has charged, and TWC annually has paid, additional franchise fees equaling 5 percent of its gross revenues.

101.   The millions of dollars TWC spent to support the operating and maintenance costs of LA's PEG programming constituted franchise fees and the City's imposition of a 5-percent franchise fee above that violated federal and state law.

102.   TWC was not required to pay a 1-percent gross revenue PEG fee for 2008 while it was providing PEG support under its local franchises at the same time and the City's imposition of a 5-percent franchise fee above that violated federal and state law.

103.   On information and belief, the City has not used the millions of dollars in gross-revenue PEG capital fees that it has collected since 2009 for PEG facilities that would exempt the funds from the federal definition of franchise fees.

104.   These PEG fees thus also constitute excessive and improper franchise fees exceeding the 5-percent federal and state caps, and LA violated DIVCA by imposing and collecting such fees.

105.   LA has collected excessive fees from TWC in violation of DIVCA, and TWC has been harmed by these excessive and unlawful payments.

106.   Based on LA's violations of DIVCA, TWC is entitled to have these excessive franchise fees, plus interest, disgorged to it so that the monies can be credited to TWC's customers, in an amount shown at trial, in addition to injunctive and declaratory relief.

**THIRD COUNTERCLAIM FOR RELIEF**

**(VIOLATION OF LOS ANGELES ADMINISTRATIVE CODE)**

107.   TWC re-alleges and incorporates by reference the allegations of paragraphs 1-106, above, as if they were fully set forth herein.

108.   LA's Administrative Code authorizes it only to charge TWC a franchise fee of 5 percent of its gross revenues.  *See* LA Admin. Code § 13.61.1(a).

109.   LA's Administrative Code further authorizes it to charge TWC a fee equal to 1 percent of its gross revenues "for PEG purposes consistent with state and federal law."  *Id.* § 13.61.1(b).

110.   LA has charged and collected franchise fees in excess of 5 percent of TWC's gross revenues.

111.   In violation of LA's Administrative Code, LA has collected millions in PEG support and fees that constitute franchise fees in excess of 5 percent of TWC's gross revenues.

112.   TWC has also paid 1 percent gross revenue PEG fees that the City has not, on information and belief, used for PEG facilities that would be exempt from the federal and state definitions of franchise fees.  These payments also constitute excessive and improper franchise fees in violation of LA's Administrative Code.

113.   Based on LA's violations of its Administrative Code, TWC is entitled to have these excessive franchise fees, plus interest, disgorged to it so that the monies can be credited to TWC's customers, in an amount shown at trial, in addition to injunctive and declaratory relief.

**FOURTH COUNTERCLAIM FOR RELIEF**

**(BREACH OF FRANCHISE AGREEMENTS)**

114.   TWC re-alleges and incorporates by reference the allegations of paragraphs 1-113, above, as if they were fully set forth herein.

115.   TWC's local franchises with LA required TWC to pay a franchise fee of 5 percent of its gross revenues.

116.   LA charged and collected franchise fees in excess of 5 percent of TWC's gross revenues in 2008 and prior years.

117.   LA required TWC to pay millions of dollars to fund PEG studios in 2008 and prior years and to provide free and discounted services, all of which constitute franchise fees in excess of 5 percent of TWC's gross revenues.

118.   LA also unlawfully demanded TWC to pay a 1-percent PEG fee for 2008.

119.   Because LA collected more than 5 percent of gross revenues in franchise fees in 2008 and prior years, LA has breached the parties' franchise agreements.

120.   LA's unlawful conduct has harmed TWC and its customers.

121.   Based on LA's breaches of the franchise agreements, TWC is entitled to have excessive franchise fee payments, plus interest, returned to it so that the monies can be credited to TWC's customers, and it is entitled to damages, in an amount shown at trial, in addition to injunctive and declaratory relief.

## FIFTH COUNTERCLAIM FOR RELIEF
### (BREACH OF SETTLEMENT AGREEMENT)

122.   TWC re-alleges and incorporates by reference the allegations of paragraphs 1-121, above, as if they were fully set forth herein.

123.   LA and TWC entered a settlement agreement in 2011 concerning a dispute between the parties over the franchise fees that TWC owed the City between January 2006 and December 2007.

124.   In the parties' settlement agreement, LA released and covenanted not to sue TWC concerning any disputed franchise fees that TWC allegedly owed the City between January 2006 and December 2007.

125.   The City accordingly waived all claims against TWC concerning the settled dispute.

126.   The parties' settlement provides that the prevailing party is entitled to payment of attorneys' fees and costs in any proceeding concerning a dispute over the interpretation, application, performance, or breach of the agreement.

127.   Under the settlement agreement, the City waived any claim that TWC underpaid franchise fees in 2007, and expressly released and covenanted not to sue TWC concerning allegedly underpaid franchise fees in 2007.

128.   The City has breached the parties' settlement agreement by demanding that TWC pay additional franchise fees for 2007, and bringing suit against TWC to recover additional franchise fees for 2007.

129.   TWC is entitled to damages, declaratory relief, as well as its attorneys' fees and costs, for the City's breach of the parties' 2011 settlement agreement.

## SIXTH COUNTERCLAIM FOR RELIEF
### (VIOLATIONS OF 42 U.S.C. §§ 1983 AND 1988)

130.   TWC re-alleges and incorporates by reference the allegations of paragraphs 1-129, above, as if they were fully set forth herein.

131.   TWC has rights, privileges, and immunities by virtue of 47 U.S.C. § 542 because TWC is a member of the class protected by the statute.  The Constitution and laws of the United States secure these rights, privileges, and immunities.

132.   Section 542 confers an implied private right of action on members of the protected class to redress violations of the statute.

133.   The City acted under color of state law when it denied TWC the rights, privileges, and immunities granted by 47 U.S.C. § 542 by demanding and collecting excessive franchise fees from TWC.

134.   As a direct and proximate result of the City's violations of 47 U.S.C. § 542 TWC has suffered harm that cannot be remediated at law, including monetary losses and deprivation of its rights.

135.   TWC is entitled to recover its overpayments from the City in an amount determined at trial.

136.   TWC is also entitled to its attorneys' fees under 42 U.S.C. § 1988.

137.   Unless and until the City is enjoined by the Court, the City will continue to deprive TWC of its civil rights.  Accordingly, TWC is entitled to injunctive and declaratory relief in addition to monetary damages to remedy the City's violations of Section 542.

### SEVENTH COUNTERCLAIM FOR RELIEF

### (DECLARATORY JUDGMENT ACT)

138.   TWC re-alleges the allegations of paragraphs 1-137, above, as if they were fully set forth herein.

139.   An actual controversy has arisen and now exists between TWC and LA with respect to its imposition of fees on TWC.

140.   TWC disputes the amounts that LA has charged and collected from it in the form of franchise and PEG fees since.

141.   TWC also disputes LA's claims to additional franchise and PEG fees and interest based on unlawful mischaracterizations of TWC's gross revenues during 2008 to 2011.

142.   Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties with respect to the amount of franchise and PEG fees LA could lawfully collect is necessary and appropriate under the circumstances.

### PRAYER FOR RELIEF

**WHEREFORE**, TWC respectfully prays for the following relief:

1)   Order LA to return to it monies in the amount determined at trial based on its overpayments to LA, so that the monies can be credited to its customers;

2)   Award pre- and post-judgment interest based on TWC's overpayments to LA;

3)    Declare that LA has violated the federal Cable Act by collecting franchise fees in excess of 5 percent of TWC's gross revenues annually;

4)    Declare that LA has violated DIVCA by collecting franchise fees in excess of 5 percent of TWC's gross revenues annually;

5)    Declare that LA has violated DIVCA by collecting fees in addition to franchise fees;

6)    Declare that LA has violated its Administrative Code by collecting franchise fees in excess of 5 percent of TWC's gross revenues annually;

7)    Declare that LA has violated its local franchise agreements with TWC by collecting franchise fees in excess of 5 percent of TWC's gross revenues annually;

8)    Declare that TWC is entitled to set off and recoupment of excessive franchise and PEG fees that it has paid against any additional fees the City obtains through its suit;

9)    Enjoin LA from charging or collecting franchise fees in violation of the Cable Act, DIVCA, and its Administrative Code;

10)    Enjoin LA from charging or collecting fees in addition to franchise fees from TWC in violation of DIVCA;

11)    Declare that TWC has not underpaid franchise and PEG fees between 2008 and 2011;

12)    Declare that LA is not entitled to additional fees based on subscriber revenues from 2007 when TWC changed from cash to accrual accounting;

13)    Declare that LA and TWC had resolved all franchise fee disputes for 2007 through settlement and LA's claim to 2007 revenues is therefore barred;

14)    Declare that LA is in breach of the parties' 2011 settlement agreement resolving claims over 2007 franchise fees;

15)    Declare that the City cannot treat PEG fees as gross revenues under DIVCA and is not entitled to additional fees on such basis;

16)    Declare that TWC's franchise fee payments between 2008 and 2011 were not understated based on non-subscriber revenues and that LA is not entitled to additional franchise or PEG fees on such basis;

17)    Declare that the City is not entitled to additional franchise and PEG fees for agency fees or discounts;

18)    Declare that TWC overpaid franchise fees based on overstated advertising revenue and is entitled to a refund of such overpayments;

19)    Declare that launch support that TWC received from programmers does not constitute gross revenues under DIVCA and that the City is not entitled to additional franchise and PEG fees based on launch support between 2008 and 2011;

20)    Declare that fees TWC paid to the California Public Service Commission constitute franchise fees, and LA is required to deduct TWC's payment of such fees from its franchise fees under the federal and state franchise fee caps;

21)    Declare that LA is not entitled to a 1-percent gross revenue PEG fee for 2008 and TWC is entitled to disgorgement of such payment;

22)    Declare that LA is not entitled to interest based on its unlawful demands for additional franchise and PEG fees;

23)    Declare that DIVCA bars LA from charging compounded interest for franchise or PEG fee underpayments;

1     24)   Declare that DIVCA prohibits LA from collecting interest on

2           underpaid PEG fees;

3     25)   Award TWC fees and costs for enforcing the parties' 2011

4           franchise fee settlement agreement;

5     26)   Award TWC attorney's fees and costs permitted under 42 U.S.C.

6           §§ 1983 and 1988; and

7     27)   Award TWC any and all additional relief that the Court deems

8           just and proper.

9   Dated:  May 15, 2014

10                    SHEPPARD, MULLIN, RICHTER & HAMPTON  LLP

11

12

13                    By   _____ /s *Valerie E. Alter*

14                         FRED R. PUGLISI
15                         VALERIE E. ALTER
                           GARDNER GILLESPIE (appearing *p.h.v.*)
16                         PAUL WERNER (appearing *p.h.v.*)

17
                           Attorneys for Defendants
18                         TIME WARNER CABLE, INC.,
19                         TIME WARNER CABLE PACIFIC WEST LLC,
                           d/b/a TIME WARNER CABLE
20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

TWC demands a trial by jury on all issues so triable as of right.

3

4

Dated:  May 15, 2014

5

SHEPPARD, MULLIN, RICHTER & HAMPTON  LLP

6

7

8

By _____ /s *Valerie E. Alter*

9

10   FRED R. PUGLISI
VALERIE E. ALTER

11   GARDNER GILLESPIE (appearing *p.h.v.*)
PAUL WERNER (appearing *p.h.v.*)

12

Attorneys for Defendants

13   TIME WARNER CABLE, INC.,

14   TIME WARNER CABLE PACIFIC WEST LLC,
d/b/a TIME WARNER CABLE

15

16

17

18

19

20

21

22

23

24

25

26

27

28